UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYLE ENTERPRIZES, INC. d/b/a
LARRY'S FOODLAND, a Michigan
corporation,

    Plaintiff,                                     Case No. 04-73136

v.                                            Honorable Patrick J. Duggan

THE HARTFORD STEAM BOILER
INSPECTION AND INSURANCE
COMPANY,

    Defendant.
_____/

**OPINION**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on November 18, 2005.

PRESENT:        THE HONORABLE PATRICK J. DUGGAN
                          U.S. DISTRICT COURT JUDGE

This action arose after the Defendant, Hartford Steam Boiler Inspection and Insurance Company ("HSB"), denied Plaintiff's claim of loss following the mass blackout that occurred on August 14, 2003. Plaintiff filed suit against Defendant HSB in the Wayne County Circuit Court bringing claims for: (I) declaratory relief pursuant to MCR 2.605; and (II) breach of contract. Defendant removed this case to this Court on the basis of diversity jurisdiction. The following motions are before the Court: (1) Defendant's Motion for Summary Judgment; and (2) Plaintiff's Motion for Declaratory Relief and for

Summary Judgment. The Court held a hearing on these motions on October 27, 2005.

**I.     Background**

Plaintiff Lyle Enterprizes, Inc. operates a grocery store, Larry's Foodland, which is located in Livonia, Michigan. The store is opened 24 hours a day. Larry Lokuta is the store's president and sole shareholder.

**A. The Blackout**

Detroit Edison supplies electrical power to Larry's Foodland. On August 14, 2003, Larry's Foodland lost power during a massive blackout that affected Southeast Michigan, Ohio, Pennsylvania, New York, and Canada. Larry's Foodland was without power for approximately 38 hours. (Pl.'s Mot. Ex. 1, Lokuta Dep. at 49-50).

During the blackout, Larry's Foodland closed its doors for business. However, because there was no way of knowing how long the blackout would last, employees came to work and were paid as usual. Larry's Foodland estimates that it lost $102,567 in stock, $7,000 in lost business income, and incurred $3,642.92 in expenses related to the loss of power. (Pl.'s Mot. Ex. 10).

**B. HSB Insurance Policy**

At the time of the blackout, Larry's Foodland had an equipment breakdown insurance policy with HSB. (Pl.'s Mot. Ex. 6, HSB Policy). The HSB Policy provides, in pertinent part:

**A. COVERAGE**

This Equipment Breakdown Coverage provides insurance for a Covered Cause of Loss as defined in A.1. below. In the event of a Covered Cause of Loss, we will pay for loss as described in A.2. below.

1. **Covered Cause of Loss – "Accident"**

   a. **"Accident"** means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

   (1) Mechanical breakdown, including rupture or bursting caused by centrifugal force.

   (2) Artificially generated electrical current, including electrical arcing, that damages electrical devices, appliances or wires.

   * * *

   b. **"Covered Equipment"** means the following:

   (1) Unless specified otherwise in the Declarations:

   (a) Equipment that generates, transmits or utilizes energy, including electronic communications and data processing equipment;

   * * *

   (2) Except as specifically provided for under Off Premises Property Damage, Service Interruption, Contingent Business Income and paragraph (2) of Perishable Goods, such equipment must be at a location described in the Declarations and must be owned or leased by you or operated under your control.

(Pl.'s Mot. Ex. 6).

The HSB Policy provides that "Covered Equipment" includes equipment not owned by the insured if it is "[o]wned by a company with whom you have a contract to supply you with one of the Covered Services," (*id.* at ¶G(14)), including "electrical power" (*id.* at ¶G(14)(b)).

In the event of an accident, the HSB Policy provides coverage for lost business income, extra expenses, service interruption, contingent business income, and perishable

3

goods. (*Id.* at ¶A(2)).

HSB denied Larry Foodland's claim for benefits. On September 23, 2003, HSB sent a letter denying Larry Foodland's claim because it found "no evidence that the power outage was caused or prolonged by damage to equipment owned by Detroit Edison." (Pl.'s Mot. Ex. 11).

## II. Standards of Review

### A. Motion for Declaratory Judgment

This Court has authority to grant declaratory relief pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201. The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. However, "[a] declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." *Eccles v. Peoples Bank*, 333 U.S. 426, 431, 68 S. Ct. 641, 644 (1948).

The Sixth Circuit applies two principal criteria to determine whether a declaratory ruling is appropriate: "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Grand Trunk. W. Railroad Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). In addition, the Sixth Circuit considers the following factors in determining whether to grant declaratory relief:

(1) Whether the judgment would settle the controversy;

(2) Whether the declaratory action would serve a useful purpose in clarifying the legal relations at issue;

(3) Whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";

(4) Whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and

(5) Whether there is an alternative remedy that is better or more effective.

*Id.*

In this case, a declaratory judgment would clarify and settle the issue of whether Plaintiff's losses were covered by Defendant's policy. Moreover, a declaratory judgment would terminate and afford relief from the controversy giving rise to this proceeding. Thus, the first two factors are met.

As to the third factor, there is no evidence that a declaratory remedy is being used to "provide an arena for a race for res judicata," especially since there is no competing state action pending. Similarly, as to the fourth factor, the use of a declaratory action would not increase friction between federal and state courts. Finally, no alternative remedy has been suggested. Therefore, this Court shall exercise its discretion to declare whether Plaintiff's losses were covered by Defendant's policy.

**B. Motion for Summary Judgment**

This Court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists for trial unless, by viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The moving party bears the burden of informing this Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53. It is not enough that the nonmoving party comes forward with the "mere existence of a scintilla of evidence . . . ," *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, or some "metaphysical doubt as to the material facts." *Matsishita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Rather, the nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

### III. Applicable Law and Analysis

To prevail on its breach of contract claims against Defendant HSB, Plaintiff must prove:

1. That a contract existed between Plaintiff and Defendant;

2. Defendant breached the obligations it owed Plaintiff under the contract; and

3. Plaintiff suffered damages as a result of the breach.

*See In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003).

In this case, there is no dispute that, at the time of the blackout, Plaintiff was covered by an insurance policy with Defendant. At issue is whether Defendant breached its obligation by denying Plaintiff's claim of loss.

Plaintiff seeks payment under the HSB Policy for its losses arising from the interruption of Detroit Edison's electrical service. Plaintiff contends that the power surge and mechanical breakdown of Detroit Edison's equipment fall squarely within the HSB Policy's definition of "accident." (Br. in Supp. of Pl.'s Mot. at 15).

First, Defendant HSB contends that the blackout is excluded from the Policy's definition of an "accident" because the blackout caused damage to power equipment in Ohio, not in Michigan. In Detroit Edison's Report, it notes that generator and transmission line outages in northern Ohio led to "several alarms indicating low voltage on the ITC and DE transmission, sub-transmission and distribution systems . . . ." (Pl.'s Mot. Ex. 5, DE Report at 17-18). As a result, Detroit Edison increased its power output. (*Id.* at 18). When subsequent failures in Ohio's electric lines occurred, "power flowing from southern and eastern Ohio sought alternative paths into northern Ohio. A substantial portion began flowing across Indiana and surged into southwestern Michigan." (*Id.*). "The balance of power . . . looped eastward around Lake Erie in a counter clockwise direction through Pennsylvania, New York, Ontario, and into southeast Michigan across the Michigan-Canada ITC-IMO interface." (*Id.* at 19). The sudden power surge on an

7

already heavily loaded transmission path started a voltage collapse on the Michigan system. (*Id.*).

Protective equipment caused certain sites in central Michigan to go out of service, eliminating their power generation to the Michigan power grid. (*Id.*). This caused other Detroit Edison power generators to increase their power output, some to as much as 300 percent of their rate output capacity to boost sagging voltages. (*Id.*). "This dramatic increase in reactive output required generating units to increase field current and resulted in damage to the exciter (the component that provides field current) at a[t] least one plant." (*Id.*). The system began to stabilize by cutting off the western side of the state from southwestern Michigan. (*Id.* at 20). This "caused a full-scale catastrophic collapse in the ICD/Detroit Edison service territory." (*Id.*).

As set out above, the HSB policy provides coverage where there is an "accident." The HSB Policy states:

> **"Accident"** means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:
>
> (1) Mechanical breakdown, including rupture or bursting cased by centrifugal force.
>
> (2) Artificially generated electrical current, including electrical arcing, that damages electrical devices, appliances or wires.

(Pl.'s Mot. Ex. 6).

In this case, the "fortuitous events" were the electrical surges entering Michigan from Ohio. Plaintiff contends that the power surges caused direct physical damage to "covered equipment"–equipment owned by Detroit Edison, which resulted in the blackout

8

at Larry's Foodland. Plaintiff cites to a number of references to ruptured "rupture disks" in the record to support its contention that the power surge caused direct physical damage to Detroit Edison equipment. The Michigan Public Service Commission Report indicates that "it appears likely that two factors *hampered restoration* efforts," including: (1) the computerized "In Service Application" system used to dispatch and coordinate personnel was inoperable because it lacked an emergency power source; and (2) failed rupture disks at four Detroit Edison generating units "slowed the pace of *restoration*." (Pl.'s Mot. Ex. 4, Michigan Public Service Commission Report at 63 (emphasis added)). In addition, Leon M. Niebrzydowski, an Operating and Risk Assessment Manager at Detroit Edison, testified that: "damage that occurred at Detroit Edison power plants *as a result of* the blackout impacted restoration efforts." (Pl.'s Mot. Ex. 16, Niebrzydowski Aff. at ¶6 (emphasis added); *see also* Ex. 17, Niebrzydowski Dep. at 55 (stating that damage to Detroit Edison equipment "[p]rolonged the full restoration of service to every customer")).

However, the Michigan Public Service Commission noted: "the presence of failed rupture disks does not, in itself, indicate a problem that needs to be corrected. Rupture disks are a design feature – they are intended to fail under certain conditions, thereby avoiding more serious damage to equipment." (Pl.'s Mot. Ex. 4, Michigan Public Service Commission Report at 63). The power surges caused "protective equipment" to engage. (*Id.* at 44, 48). Specifically, the equipment is designed to detect voltage fluctuations and "trip off" to protect the system from damage. (*See* Pl.'s Mot. Ex. 3, U.S.-Canada Final Report at 73). Consequently, there is nothing in the record to indicate that Larry Foodland's loss of power was caused by direct physical damage to Detroit Edison's

9

equipment. Rather, it was the engaging of the protective equipment which caused Larry's Foodland to loose power.

The evidence in the record before this Court supports Defendant's contention that the loss suffered by Plaintiff was not caused by direct physical damage to Detroit Edison's equipment. In this Court's opinion, Plaintiff has failed to meet its obligation to come forth with "significant probative evidence in support of its opposition to the motion for summary judgment," *Moore v. Philip Morris Cos., Inc.*, *supra* at 340.

Alternately, Plaintiff argues that damage to Detroit Edison's equipment caused a significant delay in Detroit Edison's return of power to its customers, and that it was this delay which caused Plaintiff to suffer a loss. (*See* Pl.'s Resp. at 5). In support of this argument, Plaintiff offers Niebrzydowski's statements that: "On a system basis, damage that occurred at Detroit Edison power plants as a result of the blackout impacted restoration efforts," (Niebrzydowski Aff. at ¶6), and that the damage to Detroit Edison's equipment "[p]ronlonged the full restoration of service to every customer," (Niebrzydowski Dep. at 55). In addition, Plaintiff asserts that Detroit Edison's equipment had to be repaired before Detroit Edison was able to supply power to its customers, citing Detroit Edison's report that it took five weeks to repair the bearing damage at the River Rouge 3 site. (*See* Pl.'s Resp. at 5-6, 6 n.3).

However, the Court does not believe that Plaintiff has met its burden of establishing that the damage which occurred to the equipment, after the power was lost, amounts to an "accident" under the HSB Policy. For example, although it took five weeks to repair the bearing damage at the River Rouge 3 site, power was restored within a matter of days.

Thus, Defendant contends that the damage that occurred to Detroit Edison's equipment which Plaintiff cites in his brief, for example the rupture disks that needed to be replaced, were not replaced or repaired until *after* the power was restored. Defendant alleges that it was the complicated "black start" procedure which caused the delay. Moreover, nowhere in the record does Plaintiff indicate how the damaged equipment affected the restoration effort, the length of the actual delay, or what portion of Plaintiff's loss is attributable to the delay. Consequently, Plaintiff has failed to meet its burden of showing that a genuine issue of material fact remains as to whether the damage that occurred to Detroit Edison's equipment, after the power was lost, caused a delay in the restoration of power, which caused a loss to Plaintiff.

Accordingly,

**IT IS ORDERED** that Defendant Hartford Steam Boiler Inspection and Insurance Company's Motion for Summary Judgment is **GRANTED**.

**IT IS ORDERED** that Plaintiff Lyle Enterprizes, Inc.'s Motion for Declaratory Relief and for Summary Judgment is **DENIED**.

                                        s/PATRICK J. DUGGAN
                                        UNITED STATES DISTRICT JUDGE

Copies to:
Kenneth F. Neuman, Esq.
Michael Small, Esq.
Edward Gleason, Esq.